Good morning. The first matter for oral argument listed this morning is United States of America v. Reyes-Romero. Mr. Cook, I'm not accustomed to seeing you on that side of the courtroom. Me neither. It's a whole different perspective. Welcome. May it please the court, Jonathan Kokus, AUSA, on behalf of the United States. Seated with me, not at counsel table, but in the front row, is AUSA, Adam Hallowell, who handled this matter very ably with the district court. If I might, I'd like to reserve four minutes for rebuttal. Granted, and I'll tell both counsel what most people who argue before this court already know, and that is when we have a case with numerous issues, whether they be a combination of factual or legal, we're not wedded to the clock. I know each side has been – it's been indicated that you'll receive 15 minutes, but I would expect that we may go a little longer. Understood. Okay. So the alpha and the omega at this point in this circuit on Hyde Amendment law is the Manzo case. So I know everybody's familiar with that intimately, but I just wanted to emphasize – It's the Third Circuit's only case on the Hyde. Right. Hence the alpha and the omega, right? It's everything. But everything in between, all those letters. I guess that's right. Yeah. Well, so I just wanted to emphasize a couple of things about that. And one, and this comes right from the Hyde Amendment itself, the focus has to be on the position of the United States, position in the singular. And the position of the United States, as we know from the Nixon opinion, is a defined term. I mean, it essentially means our position in the lawsuit. So Manzo and really every other circuit I could find that discusses the issue addresses the position as what the prosecutor is arguing, what the DOJ are advocating within the scope of the lawsuit. Before we go any farther, this is a matter that proceeded essentially in two stages, if you will. Resulted in two opinions, a hearing that covered a number of days, a series of exchanges between Judge Hornack and counsel. Judge Hornack made, as we all know, numerous findings of fact that did drive his ultimate determinations at both phases. I'm sure my colleagues will be exploring some of those as well. But could you help us with how, if at all, those factual findings can be reexamined, if you will? Or to put it another way, are they subject to collateral attack here? I believe they're subject to collateral attack. Look, the reasons I gave in my reply brief were the official reasons for why we, our office, did not take an appeal of the order of dismissal. That was a pretty critical decision for the government to have made here. It was. Not only in terms of what we know now, but it was an important decision to be made at the point in time when it was made. Correct. And so let me emphasize, so I personally was not involved in that decision. I didn't learn about this case until the Hyde Amendment decision comes down and it's all on fire. I will tell you, if I were involved, I would have a much more direct reason for not appealing this. And it's simply that I don't think we could have. And the reason is Mr. Rowe moves on behalf of Reyes-Romero for the order he wants, the judgment he wants, is dismissal of the indictment with prejudice. In February 2018, we moved for dismissal of the indictment with prejudice. Now, at that point, the court is playing with house money because as long as it grants somebody's order, some order of dismissal with prejudice, the other side doesn't really have a case or controversy to take up. I mean, the Supreme Court has said in Jennings v. Stevens in 2015 and Chevron even that courts of appeals review judgments and not opinions. Your motion to dismiss was denied, right? It was. That wasn't appealable? I'm sorry? That was not appealable? As a practical matter, I don't believe it. Well, let me put it this way. What about as a legal matter? I don't think it's a legal matter because of Jennings v. Stevens. So you would be asked then to review an opinion and not a judgment because we would be coming to you, hat in hand, saying, yeah, we have no problem with the judgment the court entered. Our problem is with the way it got there. And I cannot imagine a court – it would be an advisory opinion, I guess. I can't imagine a court giving us a decision based on that. I'm taking it from your argument, although you've not put it this way, that what you're trying to do is avoid, for purposes of the eventual Hyde Amendment determinations, any suggestion that what Judge Hornak did with respect to the motion to dismiss constituted res judicata. Agreed. That is our position. What if it is res judicata? Well, then I think you have to go through how much of that was gratuitous in the motion to dismiss versus how much was necessary in the motion to dismiss. And really, all he had to find in the order granting Mr. Roe's motion to dismiss was that the forms that led to the 2011 removal order were not voluntary – were not completed voluntarily. Everything else in that is dicta. And, in fact, by the time the judge reaches our motion to dismiss, that thing is moot. That is moot by that time as the bond motion is. Why isn't that a basis for appealing that order? If you think at that point it was moot, there wasn't jurisdiction, wouldn't that be a basis for requesting relief or vacating at least portions of the opinion? Then what happened – so, first of all, now you go back to – you have to imagine us, the DOJ, can't just appeal anything we want. We have to go to the Solicitor General. And, again, not being involved in this personally, I don't know what discussions we're having, but I cannot imagine the Solicitor General saying, yes, you're right, bad opinion on your motion to dismiss is moot, but how in the world can we expect to go to a court and get a – I don't understand what difference the reasons for the decision make here. Whatever the reasons that the government considered and relied upon in its determination not to appeal have no import for us in terms of whether or not what we've got here is a final appealable order today. I think you have to take into consideration, first of all, that we're not like the typical party in this case. And the Hyde Amendment in every situation is going to be applying to us, the DOJ. If I accept or the law becomes what I think Your Honor is sort of saying, then every time we get an adverse order and we think there might be a whiff of a Hyde application coming, we have to take a protective appeal just to ensure that that thing doesn't happen. That is going to multiply exponentially the number of appeals. But that's a policy argument, right? It's a policy – it's a practical – it's a real-world argument, I can tell you. I don't disagree. To the extent you're speaking to the issue – to issue preclusion, one of the things we look at with issue preclusion, separate from whether it's the same issue and whether it was necessary to the decision, is also whether there was a full and fair opportunity to litigate it, including the motivations of the party to litigate it. I take it that the argument you're making is that the government didn't have a motive at the time to contest those findings given the judgment, and that were we to rule there was issue preclusion in the circumstance, that it might set up a perverse sort of incentive for the government to take knee-jerk appeals. It would. I mean, that's the way I look at it anyway, is that we would have to, every single time a word of dismissal comes down, take a protective appeal, otherwise risk some court finding that, well, no, you're stuck on the Hyde issue with all of the findings the district court made in the order of dismissal, no matter how necessary those were to the order, no matter how well litigated they were. I mean, keep in mind that Charles Weld, Note 17, we never even get a chance to litigate that, because that's brought up in a reply brief. Even if we assume it's law of the case and not issue preclusion, so we're not bound by those findings, still we would be reviewing for clear error, right? Correct. You'd be reviewing for clear error. And where we have findings that go to things like witness credibility and determinations of witnesses' motives, what is your argument based on the record about why we should find that there was clear error in those findings? So the clear that we care about for the Hyde Amendment purposes now is the court's really repeated findings again and again that the two agents were liars and that they lied repeatedly to them. And the problem that I have with it is when a court makes a finding like this, I don't know if you guys are all aware, but the agency that employs those agents... Oh, believe me, this is a very, very troubling aspect of the case. I can assure you every member of this panel is very sensitive to that and very aware of that. We've got two agents here who have had findings made essentially against them, which undoubtedly, with findings that stand, will affect their careers going forward. Not just their careers. Not only that, but their appearance and testimony as witnesses, if they are ever called again. Not just that either, Your Honor. It also, because the agencies take this so seriously that when a court finds that one of its own has committed perjury, which the court at one time did use that word, that gets referred back to us for possible prosecution for perjury. So when this judge is calling these people liars willy-nilly, that is putting their personal liberty on the line. All right. And as I've tried strenuously to do here, this panel is very, very sensitive to, I'm sure, and we're very aware of all of those implications. That said, the question Judge Krauss asked you about credibility and motive, those are factors that a finder of fact is uniquely in a position to determine, not a court of appeals, not a reviewing court. What do we do about that? Well, it doesn't mean they're unreviewable. I understand when the findings are based largely on demeanor or something, and the court used that word I think one time, but largely the findings that these men were liars was based on these so-called lies that they told in their testimony. And when I review this case for possible prosecution and I get through this testimony, I think I missed something. The judge is citing the record. He's quoting the record. I think, all right, I maybe have to read the whole thing to figure out where the lie is. And when I read it again, the problem becomes the judge is almost playing a telephone game with himself, where he remembers correctly on January 4th, 2018, that he asked Officer Dargy, does the procedure, the import of his question was, does the procedure that was used here make any sense? And Dargy said no. That's candid, right? He is essentially saying, I don't know if he's saying he's screwed up, but he's saying this is messed up. Wasn't that response actually that the answers that had been given prior to the recess didn't make sense? Now, the answers were about the process of the procedure that followed, but contextually that's what I understood the witness to be responding to. Correct. The judge had said, and my understanding is right. A26, he makes the following two contradictory selections, and then the H51 comes along and that's contradictory to everything else. I mean, the judge is not wrong. Whatever procedure was used here, and there's no reason to doubt this was the procedure, was incredibly confusing, even for us. Well, it was both confusing and in some measure redundant, if you will. Yes. Right? And in some measure nonsensical. And in some measure nonsensical. Because he can't do two things at 9 o'clock, and he said the clock on the wall is the time we put down. Yes. And you've got McCulley approving at 10, and Alastair doesn't finish the Spanish translation until 9.20. Temporally, none of that makes any sense. Well, no. McCulley part, he signs when the service has been completed. This is a big part of the area where the judge went astray. And part of it is Mr. Hollowell did not have the opportunity to prep the witnesses on the questions about the time discrepancies because Mr. Rowe did not raise those. Those are not raised until the morning of the hearing when the judge says right out of his mouth, what happens if I dismiss this? Here are the problems I have. So now Mr. Hollowell is in the unenviable position of any attorney of having to put witnesses on the stand and ask them a question that he doesn't know what the answer is going to be. He doesn't know how to ask them these questions so as not to confuse them, and sometimes he does confuse them. But there's a big difference between signing something after it has been served and signing off on it, which is what legal counsel somewhere at DHS, they signed off on or approved. At the very least, it seemed as though this was a botched job. Absolutely. And it may be. One of the things that's troubling to me about the record is it may be worse than a botched job because we didn't get recalled witnesses to tell us why did Dargie mark in blue pen a diagonal through what appeared to be a preprinted X, correct? Correct. And I would like to know also why do you preprint X's in boxes? That doesn't seem to make any sense, right? Doesn't seem to make any sense to me. So as I understand your position, Mr. Koch, is you're starting from the principle that this was botched at intake, shall we say. Yeah. But that doesn't mean that the prosecutor who learned late in the game that it was botched at intake acted in bad faith or frivolously or vexatiously. No. In fact, he did at every turn things that were quite hard to do. I mean, it's hard to put witnesses on the stand and ask them questions you don't know the answer to. And it's hard to listen to the judge call them liars. It's hard to move to dismiss your own indictment. It's hard to look at a judge who so wants you to call your own witnesses liars and demur because that's really the most he can do at that point. And he's doing exactly what you want prosecutors to do, and he's getting punished for it. Well, one thing he might not be doing that you want prosecutors to do, and this seemed to animate the district court, is the notion that the assistant U.S. attorney was working hand-in-hand with the client, right, and members of DHS were participating every step of the way. In fact, it appeared at all but one hearing. And the district court was troubled by the fact that despite this cooperation, coordination, and communication, when it came time to get an answer from DHS, hey, would you give the guy a notice to appear? Hey, would you agree that you're not going to go forward with an administrative removal because it was, as you have conceded, a botched job? The district court got no satisfaction on that. Isn't that problematic? It's a problem. It is not a problem that we created, and I'll explain to you why. On March 1, 2018, at that hearing, it's supposed to be a hearing about something else, but no interpreter had been ordered. So it becomes about now the competing motions to dismiss. At that time, Mr. Groh says, no, I want you to grant my motion because otherwise DHS can rely on those 2011 removal documents and this guy could be, you know, railroaded again without process. Now, at some point during that, he indicates, you know, it might be a different story if you would serve my guy with an MTA. That's March 1. March 2 comes around, and that must have gotten back to DHS through the guy at counsel table, wherever that was. So March 2, DHS offers to serve him an MTA, and he refuses. Okay? That would have given him everything he wanted because an MTA is a notice. The A stands for appear. He's going to appear before an IJ, and the notice is not that you're going to be removed because you're an aggravated felon and you've come back in, you know, after being removed. Mr. Kogut, we've been spending most of our time, almost all of our time so far, on what are essentially factual issues or fact-based issues, and we can't leave those entirely, but let's turn to Hyde Amendment land and some of the issues presented by virtue of the Hyde Amendment. You've already, I think, touched on at least the position of the United States. What if you are stuck with we must recognize the findings that have been made and recognize them also as not clearly erroneous? What of your position with respect to what was the case as an inclusive whole here, and isn't that your strongest position if you are stuck with the district court's findings? It is, and the case is an inclusive whole. So remember, you first consider it at the inception of the indictment. Well, no one disputes Mr. Reyes was an alien. No one disputes that he's found here again, and no one disputes that he had been removed pursuant to a deportation order. We have all of that in his A-file. We don't have a whiff in his A-file of fear of persecution or torture or anything like that. That's a clean indictment right there. It's not until the January 3rd, 4th hearing where it becomes clearer to us, more than just with Mr. Rowe's claims about the problems with the forms, but the judges, that something has gone seriously wrong with the service of the forms. We're not going to be able to meet the two Charles Well factors. So we go, as of January 4th and then on, it's all about prejudice for us. And that's all Mr. Hollowell does, but it's almost like the judge is doing a slow burn here, and he keeps trying to drag us back to the forms and the agents lying and all of that. And from our perspective, as problematic as his belief in those findings are, they aren't relevant to us because our position, the one driving the car, is that there wasn't prejudice. Many of the district court's questions and comments did, as you've been suggesting, go to the performance and obligations of the prosecutor here. And I spent a lot of time with this record, and then it occurred to me I ought to take a look at the United States Attorney's Manual in terms of its dictates. And I want to hear from Mr. Rowe on some of these points as well. One section of the manual says, it is the responsibility of the Department of Justice to enforce the law vigorously, and it cannot abdicate this duty because of possible embarrassment to the other agencies of the government. What do you make of that? Well, to be candid, I had not thought about that coming into this. That is consistent with our job, and sometimes that creates, that's part of what makes this job hard, is sometimes we want to do something that is not consistent with or even antithetical to the interests of an outside agency. And, you know, when you have personal relationships with them and you're working with them on other cases, it can be difficult. The Department of Justice and this prosecutor's interest here was the prejudice-villanone determination yet to be made, right? Correct. It was a purely legal interest, legal determination to be made. Right. From January 4th on, that was the position of the prosecution, despite the court more than implying, stating, contrary to the record, that we had, you know, been pushing the forms the whole time. Another section in the manual states, prior to dismissing any indictment, that the United States attorney should consult with the referring department or agency and also seek to obtain the views of the investigative agency involved in the matter. What do you make of that? I can tell you that that did happen here, really to that exact extent, which is the following. The decision was taken, again, I was not involved, but the decision was taken on Sunday in late February 2018 to dismiss the indictment. And that was Mr. Hollowell and the top brass in my office. Not DHS at all. Nobody. We take that decision. We advise them, I believe, the next day that we have taken that decision, and their response is to freeze the redactions of the family's A files, because that's very onerous time. But my interest here is in terms of the Hyde Amendment and what it is intended to go to, which is essentially, elementally, bad faith, even though it's vexatiousness, frivolousness, and bad faith. Really, bad faith is at the heart of all of that. So what's the impact of a command from main justice, if you will, a command that is reduced to writing in the manual, on the prosecutor's performance in this case? In my view, he is. And ultimately, the legal issue of the case as an individual. Correct, correct. I think he has handled this case throughout, and it became very difficult, not just because the immigration issues are difficult, not just because the judge was difficult in this case, but he's handled this case at every turn exactly the way that I would have done on my best day. But that still doesn't answer my question as to how that plays into the legal determination of whether or not what we have here are findings of fact that, or even comments of the judge suggestive of bad faith, that will ultimately go into the mix in determining cases as an inclusive whole. Well, for example, the judge's finding that we colluded with DHS or something, I don't know how you reconcile, how we could... Let me give you one last section from the manual, again, because I'm going to want to hear from Mr. Rowe on these as well. In a criminal case, the United States attorney should not, for any reason, promise an alien that he, she will not be removed without prior authorization from the Department of Homeland Security and the Assistant Attorney General of the Criminal Division. What about that? Well, and we didn't make such a promise. I can tell, Your Honor, that... But the district judge wanted something of that nature made. And I can explain why I love it. So this all, now this all depends on, the answer to that question depends on where Mr. Reyes physically would have been at the time the district court issued its order of dismissal. And there were several options. If the court dismissed this in open court, then he falls to the detainer of ICE, DHS Pittsburgh. That didn't happen. If the court had bonded him out where he lived with family in Jersey, I believe it was, and while he's on bond, the court dismisses, now he falls to ICE in Jersey. If what actually happened happened, which is that the court issues the opinion while Mr. Reyes is in an NEOCC in Ohio, Youngstown, then he falls to ICE there, and now he's in the Sixth Circuit. So that's why he's now coming up through that. Now, all of those possibilities, DHS is not a monolith even within itself. We would have to try to secure hypothetical agreements with DHS all over the place, and who knows if some might agree, some might not, and none of them might even need to come to pass. So this is the district judge, I think, and I don't fault him for this, but he doesn't appear to be understanding just how difficult it is sometimes to do the thing that would make his job easy. I get it, it would have made his job very easy. It would have made Mr. Rowe happy if we could have done something like that. We contemplated it. That's why we didn't pursue it. One of the things that seemed to be troubling the judge was the idea that as a result of the judge's questions and what came to light with the forms and the different, the color version of the forms, that the initial removal, the initial notice and that initial removal was invalid. And the judge seemed from his statements to be suggesting he perceived the prosecution to be pursuing the motion to dismiss as part of a strategy to allow that notice to be reinstated, that word to be reinstated, rather than a new notice to appear. If we accept the judge's finding that that is, that that was in fact the intent, are we then looking to this litigation position and would that constitute bad faith? I don't even think that would constitute bad faith, honestly, because, you know, DHS could do whatever it wanted to do with that form regardless of what the judge, you know, the judge could hold it invalid. DHS still could have tried to rely on it. Nothing was going to change that. I can tell you that when we moved to dismiss, part of the calculation was Mr. Reyes's guideline range was like 15 to 21 months. He had already served four to five months. About 90% of illegal reentry cases in our district received time served. They go right back to DHS anyway. So the cost of us continuing to go in for day after day of bond hearings of all things, bond hearings, which would be mooted by just a decision on a motion to dismiss. That plus the redaction of the forms, you know, plus just our overall concern with where this thing was going with the judge, that's why we moved to dismiss. You noted that a new notice to appear had been offered many weeks, more than a month before the judge issued his opinion here. About three, four months. Was that communicated to the judge? Was the judge aware that that offer had been made before he issued his decision? Oh, yes. Mr. Hollowell and Mr. Rowe had both discussed it at length at a couple places in the record, and I have cited those in my brief. And I will say, just one more thing, if we were in any kind of collusion with DHS, we would have much preferred that they not offer him an NDA. We would have preferred that they serve him one like DHS does, because that takes away, that wouldn't allow Mr. Rowe to sort of wrap things around the axle. Now all the judge has to do is decide, okay, I'm going to dismiss this with prejudice, right? He no longer has to worry about what DHS is or isn't going to do with the 2011 removal documents. And what about the judge's frustration with the prosecution merely declining to press D-1 and D-2 and not having the prosecutor himself label the law enforcement agents or state on the record that he agreed with the judge's assessment of their credibility? Well, I mean, the Napew-Harris-Stapmauer line says that we have to disclose it to the court when we know one of our witnesses is lying. To find us to a committed bad faith, as the judge did for not agreeing with it, means now it is not only misconduct for us to not disclose when we know a witness is lying, we have to agree with any judge who claims or who decides that he or she believes a witness is lying. But that's, you know, that is the problem, is we fail to say yes to a number of things that the judge wanted. Well, we aspire at DOJ, we don't always succeed, but we aspire not to be yes-men to anybody or yes-women to anybody. That is what makes this job difficult. May I return to one of those injunctions I invoked from the manual, and that is, again, to relate it to, relate this passage to the determinations made by the district court. It is the responsibility of the Department of Justice to enforce the law vigorously, and it cannot abdicate this duty because of possible embarrassment to other agencies of the government. Your prosecutor adhered to what the government's position was and had been, and that position, his actions, were entirely consistent with what he's instructed to do in the manual. Correct. Do either of you have anything further? I told you we're not wedded to the clock here in the 15 minutes. We will have you back on the bar. Thank you. Mr. Rose. Good morning. Good morning. May it please the Court, I'll be appearing today on behalf of Appellee Mario Nelson Reyes-Ramiro. I'll refer to him as Reyes. If you take the 30,000-foot view of this case, and you try and get the question of whether, as an inclusive whole, the government's position was frivolous and in bad faith, I'd suggest you start by looking at the hearings that transpired on, I believe it's March 1st and 2nd. I may have my dates off by a tiny bit. March 1st and 2nd, 2018. At that point, the government's attorney, Mr. Hallowell, was asked, why does the government want to dismiss this case? There was some discussion of, well, there's a matter of resources. Then it was a discussion of litigation risk. There's litigation risk in this case. There's another statement at 646 of the appendix that refers to the risk of affirmative defenses. Reyes is affirmative defenses. The question in this case is, is that a risk to the government? What's in that risk? It goes to the question of, does the government have a risk that Reyes might win his immigration case if this criminal case goes badly? How could that possibly be the case, though? That's one of the things that I think is most interesting and difficult in reading this record. I guess it's just the way it is that these immigration cases often drive these criminal cases. Isn't that what happened here? It appears to have driven what the government did in this case. And what you did on behalf of Mr. Reyes. To some degree. I mean, let's face it. When you read the transcript, it's clear that the government doesn't want to deprive DHS of the opportunity to remove Mr. Reyes from the country for whatever reason it might have. And you, likewise, are doing what you can to secure an agreement or an opinion from a district court judge that's going to allow him to remain in the country. Isn't that clear from the record? No, for the following reason. The issue, what was the problem? Why wasn't the NTA accepted? And if you go back and, again, look at these hearings, and particularly the March 2nd hearing, there was a discussion. The government says, well, DHS will offer you, your client, an NTA. What's not to like? Discussion which is reflected to some degree in the record. Well, if that NTA comes along, would he be able to pursue asylum? Answer, no, because we have the prior order of administrative removal which rendered him ineligible for that. Question, would the government be willing to strike the prior administrative order of removal so that he can pursue, in Judge Hornak's terms, asylum on a clean slate? Can't help you with that. Right. Well, that's what, to my question to Mr. Kokas, the judge was bothered by the fact that when it served their purposes, they were working with DHS hand in glove. And when it came to things like that, they demurred and said, well, we don't control what they do. But, you know, you knew by then, I think, or at least, I mean, I guess nothing's for sure, but you had really, really good evidence at this point that the 851 was not going to hold up, right? If, for starters, if Reyes made it to Cleveland for the hearing, the government was unwilling to commit that if he was taken out of Marshall's custody, that he wouldn't be removed pursuant to the extant administrative order of removal. All right. To that degree. I mean, that's extreme, I know.  All right. So the real risk wasn't that you wouldn't win in a hearing on the validity of the 851. The real risk was that they'd rush him out of the country on the 851. Or that the remedy that's available to him is a much lower, is a much higher standard burden of proof. All right. But let's get to the prejudice issue, though, because you've got to prove prejudice on your affirmative defense, right? You have to prove, under Charles Will, under these circumstances, you don't need to prove prejudice. So you're going to rely just on the presumption under footnote 17? It's a holding by this court. I think it's probably appropriate for me to rely on that as a part of my argument, sure. What way is that footnote a holding? It was a commentary that was not necessarily the disposition of that case and has not been ever implemented or followed by either this court or any other court of appeals. If I remember correctly, in that case, there was actually a remand because there were procedures that were necessitated by the problem in the initial proceeding. Not because of a presumption, however, right? I don't want to misstate the record of the holding of the court. It wasn't sort of a wild goose chase. We'll just talk about a hypothetical case. It was discussing this type of problem. Assuming that would be something of an extension of our law, is it your position that if you had to show prejudice, that that was so clear that there was prejudice, that the government contesting that in any way would be baseless? Well, Your Honor, if you look again, going back to what I said about this, the issue with the litigation risk. In struggling with that litigation risk, the government itself struggled with the concept of prejudice. So that the government, when the government came in and said, we want to move to dismiss this case. Question, why do you want to move to dismiss the case? Well, the government says at page 645, they've reviewed the relative's A files and they can see why Reyes might have a case here. Okay? Then, down at page 1190 to 95, they're arguing there's no basis for an assertion of prejudice because Reyes would have lost the immigration case because there's no evidence in the files. It's a contradictory position. Well, it's because the judge made them fight. I mean, they rolled over and played dead. They were willing to dismiss, and the judge isn't dismissing it. So they've got to fight, even though. And the only ground it was clear after the January hearing, it's pretty clear that Mr. Hallowell noted that the court wasn't buying what he was selling on the first two prongs. And his only argument that might work with this district court was the prejudice argument, right? But they're fighting, Judge. They've got a situation where they have indisputable evidence under, for example, Mendoza-Lopez of a gross due process violation right off the bat. They see, oops, the documents are completely screwed up here. So they can't do any of that. So then they want to dismiss the case. Of course. As a prosecutor, I would not want to walk into a trial on this case having seen what happened to the two government agents in the hearings. Correct. You fold. And it is highly unusual, both at the state level and the federal level, as I'm sure you know, for a judge to refuse the prosecution's motion to dismiss. And our court has recognized that essentially and indicated what the import is of that refusal, right? I mean, a judge can't force the prosecutor to come into the courtroom and try a case. You just can't do it. That's one of the reasons it's very rare for a court to deny a motion to dismiss. Your Honor, this is the reason for Rule 48 of the Federal Rules of Criminal Procedure. Yes, that's what we were looking at in our earlier case from this court. And what the government walked into is a situation where we hear about this was all just dicta. He didn't need to do this. He could have, he could have, it was mooted and so on. Richard contemplates that a judge will make inquiry about a dismissal before rubber stamping it or without rubber stamping it. No rubber stamp here. The judge has authority under Rule 48 to grant or deny leave. And so what happened here was the government found itself in a completely contradictory situation where it was saying that it was arguing, well, maybe there is risk, but we're going to argue against the risk. Given the nature of litigation and risk, unless there is no possible basis for contesting prejudice, then there is an open issue as to that element. And the district court here seemed to acknowledge that that was an open issue by inviting continued briefing on the issue of prejudice. So if the judge thinks it's an open issue, and we have just yesterday on the elements clause, the Supreme Court granting cert on that issue as to whether it's a particularly serious crime, we held in bastardo veil that that remained a possibility, even if it's not an aggravated felony. And one can dispute the merits of the asylum claim. In fact, it appears, and you're welcome to address the fact that the IGA and BIA, in the Sixth Circuit matter, have rejected that claim. So if there is a reasonable basis to dispute it, then why would we hold that the government will be sanctioned if it doesn't concede the merits of an element of affirmative defense that it thinks, in fact, doesn't have merit? The government found itself in a very difficult position in this case. But they said, please, let us get rid of this case. We don't want this case. But at the same time, they are vigorously advocating. Why? Because they are advocating against a potential immigration result. That's the only purpose that is served by filing their briefs. That is the only purpose that's served by making arguments. Well, you're suggesting the government needs to concede the merits of a legal issue that is relevant, actually, to the prosecution, right? And isn't that what the district court was essentially demanding of the prosecution? The district court was faced with a situation where it had forged documents and false testimony. That's not an answer to my question. We're talking about prejudice. The district court says at page 543 of the appendix, this is toward the end, I think, of the January hearing, the district court says, so to me, the only open issue in the case as it now exists is prejudice. So when the district court identifies prejudice not only as a live issue but the only live issue, how could it be improper or frivolous for the government to make its best argument, weak though it may be, or maybe not, on prejudice? First of all, at the first hearing, I was saying Mendoza-Lopez. This is fundamentally unfair. Charles Weld is just an application of the footnote. It's just an application of Mendoza-Lopez. It was clear from day one that this was a tainted prosecution. Secondly, you go forward. This is a Hyde Amendment case, okay? So the court, they've made a decision. We want to get rid of this prosecution, but we want to continue fighting him on prejudice. That's a decision. I didn't make that decision for the government. The government made the decision. Wait a minute. Let me just slow you down a little bit, or maybe I misunderstand your position. What I heard you just say is that the government is trying to dismiss the case and the government wants to fight on prejudice. That's correct. But if the government's request to have the case dismissed had been granted by the district court, there's nothing to fight about on prejudice. The case is over. We've got a criminal case that is over. So then what happens is we move back into immigration law land, and that process plays out however it plays out, and Mr. Halliwell and his office has nothing to do with that, right? The difficulty is the internal contradiction of the government. The government wants to get rid of the case, but it has to be on its terms. And you want the case disposed of on your terms. That sounds like our legal system, competing interests, lawyers from both sides, duking it out, doing the best they can, and you won. You persuaded the district judge that the case should be dismissed your way rather than the government's way. So then the question for us is, okay, what looks like bad faith or frivolousness here? It looks like two really capable, zealous lawyers doing good work on behalf of their clients. Why isn't it that? The problem is that somebody's got to pay for it. The government has this document or set of documents that are forged. The government brings in... What do you mean somebody has to pay for it? Because, Your Honor, if the government... Mr. Reyes files his motion to dismiss. The government chooses to oppose Mr. Reyes's motion to dismiss. The government could have decided, let's not oppose Mr. Reyes's motion to dismiss. The case would then have been dismissed. They only opposed it conditionally. The record is quite clear that if the district court entered an order saying, indictment dismissed, period, they had no objection to that. The only objection was to some statement within that order that purported to have an impact in the administrative proceedings. And the difficulty was that by that point in time, it had been disclosed after months of hard work that the government agents who had participated in bringing this case had doctored the record and given false testimony. All right, let's put this back in the context of the Hyde Amendment. And returning to Judge Hardiman's question, which at least to me has, among other things, some temporal significance. We reached that juncture where the only thing left is this issue of prejudice. And as Judge Hardiman's question suggests, both sides were vigorously pursuing their own positions, their own interests on that. Tell me how that conflict, as it was, plays into the case as an inclusive whole. Because you look, Your Honor, were you done, Your Honor? Yes. Okay, thank you. You look at the overall, what has occurred in this case? The agents had done what they did. They came in and each testified that the alien always holds the pen. And we go forward, and the situation is dissected pretty early on, January 3rd, January 4th. We're pretty clear that this is a very troubled case. We then go forward, and at different points along the way, the government makes assertions, starting with the frivolous contention that was made at the January 3rd hearing about this document, being 826, being irrelevant. We then go forward. We have a series of events and arguments that are made over the entire time, course of the litigation. And you look back, and you see that the driving concern here on the part of the DOJ was to— to provide certain evidence, characterize certain behavior. But that is not responsive, at least not to me, to the question that I asked. And perhaps I should have asked it in a more specific way. If this panel were to determine that at the point the government decides we are going to rise or fall on this prejudice issue, or we're going to throw in the towel and move to dismiss, we're not going to concede this prejudice issue. If we determine that that was a fully appropriate step for the government to take, that there was not bad faith infused in that decision, how do you have a case as an inclusive whole that would warrant the grant of counsel fees and costs under the Hyde Amendment? I think, Your Honor, that that would involve—Manzo has a bad faith, an objective standard for bad faith, as I understand it, so that the court can look at the overall what was going on in this case. Is it bad faith? So if we set that aside— I don't think—I don't think Manzo holds that, but I think there is perhaps another circuit's case that says that for purposes of context, you can consider investigatory steps taken previously. But tell me how you—how do you define a case as an inclusive whole? What does it mean? It's at least the case from indictment to dismissal. So, again, if we determine that there was no bad faith in the government's adherence to its legal position on prejudice, how do we ever decide that what the government did, that is, that whatever bad faith may have occurred here, infused the case as an inclusive whole? I'm trying to answer the question. I want to talk about frivolousness for just a second, okay, because there are problems with frivolousness here apart from bad faith. Do you think the prejudice argument was frivolous? I think that in the criminal case as a whole was frivolous because it's the vehicle that they're riding here, that Judge Warnak is asking these questions about, starts with the indictment. The indictment says that he was removed from the United States pursuant to law. By about January 3rd, it was clear that he was not. And so they're pursuing a criminal prosecution in federal court with an indictment generating legal costs based on an indictment. When did the colored forms—I thought the colored forms came in in June or May. That's when I—they came in in March. That's when I got them. Well, you were given an opportunity to look at them earlier, weren't you? And you chose not to do so. You're right. I—no. In the sense that—and actually, if you read the— You were not given that opportunity. The Dredtke case, I believe, discussed— I'm not asking about a case. I was—I don't believe— I'm asking you the history of this case. I am, Your Honor, trying to answer it. The norm in a Brady context is I don't have to take a deposition to determine whether I'm being covered. I'm only asking you a yes or no question based on the chronology of this case. And you're entitled to answer it any way you want to. But, I mean, either it happened as a historical fact or it didn't happen. I would say, Your Honor, I would give it a no with an explanation. In my experience, receiving Rule 16 material in numerous cases, okay, there is a statement in the Rule 16 disclosure here. There is no exculpatory evidence. I have the highest respect for the U.S. Attorney's Office. And when the U.S. Attorney's Office tells me there is no exculpatory evidence, I make the assumption they're telling the truth. The U.S. Attorney's Office looks like they got fan-bagged here, doesn't it? By DHS, quite conceivably. But then, going back to the central contradiction, they can't acknowledge that. Okay? Your obligation with Brady material is simply to turn it over to you. It's not to characterize it in a way that you might characterize it. I think, just to go back, because I'm not clear on your answer to Judge Smith's question, were you given an opportunity to look at those papers, to look at the forms that came up in the course of these hearings? I was given the opportunity. I was given the black and white copies. I did not. I could have said, hey, I need to see the colored copies. I didn't make that request. And you had no reason to do that. Nobody did. Everyone, I mean, I think we're making this perhaps harder than it needs to be. Everyone was surprised and probably troubled when they got the colored copies, right? And Mr. Hallowell, from my reading of the record, correct me if I'm wrong, as soon as he got the colored copies, he turned them over to you. Did he not? And the court was advised as well, correct? I'm sorry, I didn't hear you. And the court was advised as well. That's correct. That's correct. But then what do we do with that? And it's an interesting situation under Rule 48 and Richards. What you do is you say, I guess, I don't know. I've never been a prosecutor. But I guess what you do is you say, my gosh, I thought I had a good case a while ago. Looked like a slam dunk. The guy was administratively removed. We presume that the forms were executed in due course. Looks like a clear winner. And then things transpired that surprised everybody in the governments as well. I don't have a case anymore. This case, let's dismiss it. That sounds like the way the system's supposed to work, not a breakdown of the system. What am I missing? Two things. Case one, Banks v. Gretke, U.S. Supreme Court, says that when there's a Brady issue, the government has a duty to set the record straight. So what does that mean? Yes, we see what you're talking about here. That would be an extension of or that's new territory under Brady. The whole case comes down to then whether we look at the government as one unified whole. Because if we do, as I understand your argument, Mr. Rowe, to set the record straight, the government had to say this 826, 851 are invalid. They're void ab initio. The administrative removal was illegal in violation of due process. And we promise never to administratively remove him from the country. That's what the case comes down to. The government writ large had to do all that. It's not enough just to say I've indicted someone in a criminal case. I have no case. Please dismiss it. That's one area of potential holding. It's a major issue. What do you do when you receive a document like this where both agents have testified, the alien always holds the pen, and oops, the alien didn't hold this pen? Here the prosecutor turned the document over. It disavowed reliance on D1 and D2, on those elements, and focused only on prejudice. Right. And then that drives you into the Rule 48 analysis. And that's where it gets very tricky because the government wants to get rid of this case. Of course you want to get rid of this case. And so it moves to dismiss. But the problem is, Your Honor, and I have a terrible habit of interrupting, and I'll try not to, but the problem is Your habit is not as severe as mine. Or mine. Rule 48, the government, for whatever reason, if you were in a civil case, the civil attorney needs to dig, before they file a complaint, they need to dig to find these sorts of things. So in the criminal context we have, okay, once they find it, they produce it. Now the government wants something. They just want to dismiss this case. Well, the Van La case and the DOJ manual that the court was referencing, you should probably go and talk with your colleagues over there in DHS about, we're seeing all these bad things, my goodness, the agents are lying on the stand, and there's this clear evidence of changing the document. What are we going to do to make sure that there's no fundamental due process violation here? Ah, we can't touch that, sorry. We want to go, we like litigating this prejudice issue because maybe it's a little gray. We recognize you had a decent country conditions case here, but we'll litigate that one and just hang on, and that's how we're going to operate here. We can't lift a finger to talk to DHS, of course, even though our manual happens to say that we can. Even though the Third Circuit has contemplated in the Van La case that there will be discussion between the agencies, and even though the DHS is attending every single hearing in this case, we can't do it, sorry. But you would have us read the inclusive whole of litigation for the Hyde Amendment to be, not the prosecution from its inception to its conclusion, but all actions of the U.S. government including related proceedings before separate agencies. Your Honor, it gets gray in terms of Judge Hornak acknowledges in his decision. It gets gray, you go back to 2011. Can you point us to any case that has held, it extends to actions of other agencies outside of the criminal prosecution? There are cases cited in the briefing in this case, and in Judge Hornak's opinion, to talk about where an agency has acted inappropriately, that that by itself can trigger a Hyde Amendment liability. We have our cases, and Manzo says if it's an isolated misconduct on the part of agents, that is not sufficient to trigger liability. But on the other hand, if the government actually adopts the misconduct, adopts knowingly a false statement, that that is enough. Are you suggesting that that's what happened here? Yes, that because of the internal contradiction in the case, the difficulty, we have a due process violation, but we can't have this person, we can't give this guy a clean slate, like Judge Hornak said he was seeking, and as I was saying, he was seeking. We can't do that, can't give an inch on that. So we've got to litigate prejudice. They only have to litigate prejudice if the judge doesn't dismiss the case. Right, but under Rule 48, he's entitled to say, well, why do you want to dismiss this case? What's going on here? Oh, it's litigation risk. Did they not have litigation risk? It looked like they had all kinds of litigation risk. Does that litigation risk term include the affirmative defenses, which might have an impact in the immigration proceeding? If that's the litigation risk, and I submit that is definitely an interpretation of litigation risk in this case, then the two agencies have merged their effort, and it's the bad faith of DHS, the bad faith of DOJ go together. I just want to emphasize, this is not a case where I'm saying, okay, we have cases. Hold on, let me just stop you there for a minute. Why would it be bad faith for DHS to seek to remove Mr. Reyes from the country? In fact, DHS has succeeded twice at the IJ level and the BI level, and we'll see what happens in the Sixth Circuit, but it just strikes me as passing strange for us to say that we should endorse sanctioning a lawyer for bad faith or frivolous conduct for making an argument that the result would have been the same when we now know that, in fact, to date, two adjudicatory bodies have said precisely that. The result is the same. He's going back. Two points here, Judge. One, this is not a sanctions proceeding against Mr. Hallowell. We're not seeking to – and any suggestion that this is a case against this individual prosecutor, that's not what this case is about at all. This is a case about the position of the United States. The Judgment Act said as much. Right. I wasn't suggesting that. What I'm asking is, isn't there something strange about saying that the argument that there was no prejudice was frivolous or taken in bad faith when it not only – it didn't lose narrowly, it has prevailed. That argument has been accepted by two adjudicatory bodies. But as an inclusive whole, whether the country conditions analysis would support an asylum claim or not, we can get to that if we need to. That, as an inclusive whole, is just a little piece of it. Why? That's a piece of the inclusive whole. Why is the government over here when we have a Charles Well footnote being triggered, Mendoza-Lopez is triggered? So the big picture here is this is a fundamentally flawed prosecution, and the government is fighting to ensure that that prior administrative order of removal is not invalidated, to in some manner possibly strengthen DHS's hand so that the two agencies have joined together because one thing that they cannot accept is the possibility that you just get rid of that prior administrative order of removal. You can't consult with the agency and say, hey – But how do you square your argument that the immigration consequences that would flow to your client were based on the H-51 when on March 2nd they offered you a notice to appear? Because – The notice to appear is inconsistent with the expedited extrajudicial removal under H-51. No, it's not, Your Honor, because there are two things. The H-51 will give you a notice to appear in immigration court, but we're not taking a position on that prior administrative order. But your argument, they were going to give them the notice to appear and then summarily remove them from the country? It's a risk. I would think that an attorney who is arguing this case may say, look, we're just going to drop the criminal case. So all this infidelity has come out, just trust us, we'll take care of you in immigration court. That would be irresponsible on the part of the defendant's attorney here. There was a standing order. It was repeatedly – there were two specific hearings, twice we said, okay, if you will agree to just not oppose Reyes's motion or stipulate to the vacating of that administrative order of removal so this person can have an opportunity to present an asylum case, as, for example, his brother did, okay? If you give him that opportunity, we're done. And the government would not do it. The government said this is impossible. We have no ability to communicate with DHS. There's no ability to do that. Instead, they chose to litigate. But they've given him that opportunity. He got a judicial hearing, an administrative hearing. So if we're supposed to – if the inclusive whole goes all the way back to 2011, why doesn't the inclusive whole continue up until the present time and why shouldn't we evaluate the fact, the historical fact, that the government didn't act on the 851 and ship him forthwith out of the country? Rather, they gave him a notice to appear and they gave him process. Actually, Your Honor, the immigration judge handled that one because after – when we went to Cleveland for that hearing, what had happened was Judge Hornak had entered his order and he had invalidated the prior order of removal so that, for example, the timeliness issue in the case, there was no one-year bar because there was a reason why he hadn't timely brought his asylum case. That wasn't the case without Judge Hornak's decision. We could easily have a situation where, okay, we've got this prior order of administrative removal. You've been here more than a year. You're done. And that was not – and Judge Hornak's order was ultimately the only way that was available to get rid of that prior order because the government wasn't – You're saying the immigration court had to follow that order of the Western District in a criminal case that didn't address the same issues as the asylum withholding and CAT claims? I would say that – and Judge Hornak was very careful to draw this distinction. There were a couple of rulings that were necessary, and there was a result in the Hornak case that was necessary, so that that would be – It was necessary to dismiss the indictment, to grant your motion? It was necessary for the district court to invalidate the 851? The judge, as part of his decision for granting Reyes's motion, needed to reach the validity of that 851, sure. Because that was the first two points. Right, so this was a legitimate thing to reach. Other things he didn't reach. The government says, well, he was off on a – he was very careful to say, I'm not telling you if he has a conclusive decision on the merits of his country conditions argument. He had to reach two issues, actual holding, which were particularly serious offense, and family, whether a family would be a protected social group. And the district court was wrong about particularly serious crime? The district court – Unless the Sixth Circuit was. Unless the Sixth Circuit comes back and says no. But could I just review my notes for a moment, please? Thank you. Let me ask you one other question. Sure. We were talking earlier about the – whether there was necessarily here a finding of prosecutorial misconduct, and you were suggesting that there was a merging of the DHS and the U.S. Attorney's Office in that finding. But the district court also made the explicit finding along the way that the government's arguments did not brush up against any prosecutorial misconduct and were reasonable and based in law. If that is the stated finding of the district court, then, one, how is there a basis under the Hyde Amendment, which allows for attorney's fees based on prosecutorial misconduct? And secondly, is it really an issue of merger, then, of the two agencies, or was the court awarding fees under the Hyde Amendment because of its view of DHS standing alone? The first part of that question would say that there were issues in the case, as there would be in almost any case, that you could say, okay, looking at that specific issue, there were good faith arguments on both sides. That happens in any case. That doesn't mean as an inclusive whole the case is not in bad faith. You could have an argument about whether something was timely. You could have an argument about how bad are things in a particular city in El Salvador. You could argue about that type of thing. But it doesn't change it as an inclusive whole. This was a flawed prosecution. And certain arguments that were made were frivolous, which the court made, for example, again on the waiver and again on the notion that this whole prosecution, the prior removal, was pursuant to law. So secondly, and I've forgotten the tail end of your question, but so that – and in terms – I remember now. The DHS, the DHS is definitely in the mix here. It's the position of the United States. There are situations where – there may be situations where an assisting United States attorney has a specific issue and they are calling and they have no agency involvement that complicates matters. But here the interplay between DHS and DOJ is central. Let's try to wrap this up, please. Sure. We have spent about an hour and 40 minutes, I think, on this case. Very good, Your Honor. Another aspect of this thing that I just touched on in the briefing – I haven't discussed finality at all. But if you read the briefing, if you go back to the briefing, a lot of the government's brief in the opening brief is about how they didn't present these arguments to Judge Hornak in Reyes II because Judge Hornak would have ruled against them. And they're coming back in and saying, well, the agents didn't really lie. If you look, even though there's the pen and they talk about the whole pen and this and that, no lying here. And what they're asking the court to do is – they had a perfect opportunity to bring this up with Judge Hornak in the hearing on the motion for the Hyde Act claim, and they didn't do it. And the notion that you would go in and say, oh, Judge Hornak was biased against them. Well, there was no motion to recuse. This is just – these are factual assertions they're now making after the fact. They're asking you to come in and second-guess Judge Hornak's credibility determination, Judge Hornak's assessment of their faith. All right. Thank you, Mr. Rowe. We've actually given you more time than we gave. Thank you very much. Douglas Rebuttal, and here we will apply not only the clock but put out the hook if it's necessary. Okay. I'll keep it quick. First, regarding this complaint that we move to dismiss on our terms, Rule 48 allows that. Richards narrows – gives three situations where our motion to dismiss our own indictment should be denied, prosecutorial harassment, animus, other kinds of misconduct. We don't have anything like that here. We made the determination based on a number of factors, and one of those of which I don't want to see get lost is Mr. Hollowell, in the course of reviewing the rolling production of the families' A files, sees that they appear to have claims for possible asylum or cap relief consistent with what they testified to on January 4th. Now, even though Mr. Reyes himself had never made any such claims in his A file, Mr. Hollowell in part was thinking, well, we'll give him the benefit of the doubt. You know, if we move to dismiss, DHS can take him back, and then with the NTA that later comes down that is offered to him, those things would allow him to assert all those claims. So when Mr. Rowe says – If he's not summarily removed from the country under the 851, isn't Mr. Rowe right about that? He's right about that. Just make sure we're clear and correct me if I'm misunderstanding. I heard his argument to be that the NTA is a bit of an illusory offer, because as long as the 851 is extant and effective and not disavowed by the government, there is a possibility that DHS will try, once he's remanded to DHS custody on the detainer, that they may summarily remove him from the country. And I think at some point you have to presume some regularity there. I get it the court was not ready, nor Mr. Rowe, ready to trust DHS. Wouldn't you agree that that concern animated a great deal of what Judge Hornak had to say during the course of his time in the courtroom and perhaps also in the opinion that he issued? His speculation that DHS might just throw a net over his head? I don't care whether it's speculation or not. My question simply was, that was the concern, a concern, that animated much of what Judge Hornak said during the course, at least, of the in-court proceedings. Right, and the parts of the order of dismissal anyway. But then he sort of, I don't know, transferred that all over to us, particularly Mr. Hollowell, the prosecutor, when it comes time to write the height limit thing. The other thing I just want to point out, I don't think DHS sandbagged this necessarily with these black and white copies. It would be easy for me to throw them under the bus. But what I think actually happened is, you've got to consider, whoever's making these copies at DHS is probably making $10 an hour. They're like printing these things out in black and white. And they give us two copies. We give one to Mr. Rowe and invite him to look at the original. And you're right, there's nothing that cries out for, if it were charts or graphs or maybe photos, we might say, hey, what's the color on this? Because in our remaining time, I'd like to ask you to address the question of remedy here, coming full circle, because as we noted at the outset, the only order that's before us is the Hyde Amendment. You opened pointing to the consequences, professional and otherwise, for law enforcement agents, as well as prosecutors and reputations of offices involved. But even if we were to rule in your favor, that would relate to the Hyde Amendment leaving intact the opinions on the motions to dismiss. So my question is, are you asking us for any relief beyond reversing on the Hyde Amendment? And if so, are we authorized to grant any other relief if we were to conclude that factual findings made here, for example, were clearly erroneous? The best you can do, and I agree, Your Honor, we can't go back into the order of dismissal and relitigate that. That's part of the calculus for us even wanting to appeal it because we thought it cast our people in an unfair light. I would just ask that you go through meticulously and look at every single thing Judge Hornak said, Mr. Hollowell did in bad faith, because bad faith means dishonesty. He is, in a paralytic way, calling him a liar every bit as much as he called those agents liars. OK, I would ask you to review what he did. And if it doesn't meet professional standards and was done in bad faith, you know, or frivolously, so be it. But when I look at this, he's giving appellate quality argument and answers at every turn to things that are thrown at him by the judge. Thank you, Mr. Kokos. I guess I didn't get my wish. Judge Krauss exercised a veto to my suggestion that we limit the time of rebuttal, but I'll get her back. Thank you very much, counsel, for your very helpful arguments. Trust me, the panel truly recognizes the importance of this case, not only to both sides, but to to the process as well. Thanks very much. We'll take the case under advisement. We'll take a brief recess.